## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| WILLIAM JOHNSTON, Derivatively on behalf of Municipal Mortgage & Equity, LLC, )<br><br>                    Plaintiff, )<br><br>        vs. )<br><br>MARK K. JOSEPH, MICHAEL L. FALCONE, RICHARD O. BERNDT, CHARLES C. BAUM, EDDIE C. BROWN, ROBERT S. HILLMAN, BARBARA B. LUCAS, DOUGLAS A. McGREGOR, ARTHUR S. MEHLMAN, FRED N. PRATT, JR. )<br><br>                    Defendants, )<br><br>        -and- )<br><br>MUNICIPAL MORTGAGE & EQUITY, LLC. (Baltimore County) )<br><br>            Nominal Defendant. | Civil Action No. _____<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, as and for his verified derivative complaint, by his undersigned attorneys, alleges upon personal knowledge as to himself and his acts, and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Municipal Mortgage & Equity, LLC ("MuniMae," or the "Company"), seeking to recover for damages caused to the Company by its directors and/or senior officers who breached their fiduciary obligations to the Company.  Named as Nominal Defendant is the Company, and as Defendants certain of the Company's Directors and/or senior executive officers.

## JURISDICTION

2.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because nominal defendant MuniMae is headquartered in this District and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

4.     Plaintiff, William Johnston, a citizen and resident the State of California, Placer County, is and was a shareholder of Nominal Defendant MuniMae during the period in which the wrongful conduct alleged herein occurred through the present.

5.     Defendant Mark K. Joseph has served as Chairman of the Board since 1996. Prior to January 1, 2005, he also served as the Company's Chief Executive Officer. He also served as the President and a director of the managing general partner of the SCA Tax-Exempt Fund Limited Partnership, the Company's predecessor, from 1986 through 1996.

6.     Defendant Michael L. Falcone is a Director of the Company and has served as the Company's Chief Executive Officer and President since January 1, 2005. Prior to his appointment as Chief Executive Officer, he served as Chief Operating Officer since 1997.

7.     Defendant Richard O. Berndt has served as a Director of the Company since 1996 and is the Managing Partner of Gallagher Evelius & Jones LLP ("GEJ"), a law firm engaged in the general practice of law. Mr. Berndt has been a partner in that firm since 1972. According to the

Company's most recent Annual Proxy Statement filed with the SEC on Form DEF 14A on July 19, 2006 (the "2006 Proxy"), as of December 31, 2005, Berndt owned 5.7% of the equity of GEJ. GEJ provides legal services to the Company, some of which are provided as part of real estate transactions and are paid for by the borrowers and some of which are paid directly by MuniMae. Stephen A. Goldberg ("Goldberg"), a partner at GEJ, serves as MuniMae's General Counsel. The Company pays GEJ directly for Mr. Goldberg's legal services at his standard hourly rates, and Mr. Goldberg is eligible for an annual stock award, but otherwise receives no compensation directly from MuniMae. For the year ended December 31, 2005, GEJ received $1.2 million in legal fees for borrower paid legal fees involving MuniMae and $3.7 million in legal fees paid directly by the Company. The fees paid directly by the Company represented 19.5% of GEJ's total revenues for 2005, and MuniMae anticipated that it would transact an equal or greater amount of business with GEJ in 2006.

8.      Defendant Charles C. Baum has served as a Director of the Company since 1996.

9.      Defendant Eddie C. Brown has served as a Director of the Company since 2003.

10.     Defendant Robert S. Hillman has served as a Director of the Company since 1996.

11.     Defendant Barbara B. Lucas has served as a Director of the Company since 2005.

12.     Defendant Douglas A. McGregor has served as a Director of the Company since 1999.

13.     Defendant Arthur S. Mehlman has served as a Director of the Company since 2004. Until 2002, Defendant Mehlman also served as a Partner at KPMG, LLP, an independent registered public accounting firm, where since 1972 he was in charge of KPMG's audit practice for the Baltimore/Washington region.

14.     Defendant Fred N. Pratt, Jr. has served as a Director of the Company since 2003.

15.     Nominal Defendant MuniMae is a Delaware limited liability company that provides debt and equity financing to various parties, invests in tax-exempt bonds and other housing-related debt and equity investments, and is a tax credit syndicator that acquires and transfers low-income housing tax credits. MuniMae maintains its principle offices at 621 E. Pratt St., Ste 300, Baltimore, MD 21202.

16.     The defendants referenced above in paragraphs 5-14 are referred to herein as the "Individual Defendants" or the "Director Defendants."

17.     The Individual Defendants together with MuniMae are referred to herein as the "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

18.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

19.     The Individual Defendants, because of their positions of control and authority as

4

directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

20.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

    a.    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business; exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    b.    when placed on notice of improper or imprudent conduct by the Company and/or its employees, exercise good faith in taking action to correct the misconduct and prevent its recurrence; and

    c.    maintain and implement an adequate system of controls and information systems, such that no officer, director or employee of the Company would make false statements about MuniMae to the securities markets or would be able to misappropriate internal confidential information for his or her own benefit and profit, by insider stock trading or otherwise.

21.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

22.     Each of the above officers of MuniMae, by virtue of their high-level positions with

the Company, directly participated in the management of the Company, was directly involved in the

day-to-day operations of the Company at the highest levels and was privy to confidential proprietary

information concerning the Company and its business, operations, products, growth, financial

statements, and financial condition, as alleged herein. Said defendants were involved in drafting,

producing, reviewing, and/or disseminating the false and misleading statements and information

alleged herein, were aware, or deliberately disregarded, that the false and misleading statements were

being issued regarding the Company, and approved or ratified these statements.

23.     As officers and controlling persons of a publicly-held company whose common stock

was, and is, registered with the SEC pursuant to the Exchange Act and, during the Relevant Period

(defined herein), was traded on the New York Stock Exchange (the "NYSE"), and governed by the

provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate

promptly, accurate and truthful information with respect to the Company's financial condition and

performance, growth, operations, financial statements, business, products, markets, management,

earnings and present and future business prospects, and to correct any previously-issued statements

that had become materially misleading or untrue.

24.     The Individual Defendants participated in the drafting, preparation, and/or approval

of the various public and shareholder and investor reports and other communications complained of

herein and were aware of, or deliberately disregarded, the misstatements contained therein and

omissions therefrom, and were aware of their materially false and misleading nature. Because of

their Board membership and/or executive and managerial positions with MuniMae, each of the

Individual Defendants had access to the adverse undisclosed information about MinuiMae's business

prospects and financial condition and performance as particularized herein and knew (or deliberately

disregarded) that these adverse facts rendered the positive representations made by or about MuniMae and its business issued or adopted by the Company materially false and misleading.

25.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Relevant Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

## **SUBSTANTIVE ALLEGATIONS**

26.     MuniMae was organized in 1996 as a Delaware limited liability company as the successor to a master limited partnership owning tax-exempt debt. The Company provides debt and equity financing to developers of multifamily housing and other types of commercial real estate. The Company invests in tax-exempt bonds or interests therein, issued by state or local governments or their agencies. Interest derived from the majority of the Company's bond investments is exempt for Federal income tax purposes. The Company is also a tax credit syndicator. As a syndicator, the Company acquires and transfers to investors' interest in partnerships that receive and distribute to investors low-income housing tax credits.

27.     Between January 30, 2003 and January 28, 2008 (the "Relevant Period"), the Defendants caused the Company to issue numerous statements concerning the Company's financial performance and the quality of the assets comprising its bond portfolio. These statements

misrepresented the true value of these assets in contravention of GAAP, SEC guidance, and the Company's own internal policies.

28.    The numerous statements concerning these matters issued by the Company during the relevant period were each materially false and misleading because they failed to disclose and misrepresented the true financial condition and operations of the Company. The following adverse facts which were known to Defendants or recklessly disregarded by them are: (1) that the Company has maintained artificially inflated asset values on a significant portion of its tax exempt bond portfolio and has not properly recognized other-than-temporary impairments in its loan portfolio; (2) that the Company has failed to maintain adequate internal accounting controls and procedures, and has, in fact, overridden controls and procedures; and (3) that the Company's dividend was being funded in part by continuing equity and debt placements, and was not supported by the true financial performance of the Company.

29.    On March 10, 2006, MuniMae announced that it would restate its net earnings for the nine-moth period ended September 30, 2005, as well as fiscal years 2004, 2003, and 2002, thereby resulting in the Company's need to file for an extension to file its 2005 Annual Report with the SEC. The press release stated, in relevant part:

> In connection with its fourth quarter financial reporting processes, the Company identified the need to record certain adjustments related to four main areas: 1) recognition of syndication fees, 2) application of equity method accounting, 3) recognition of interest income, and 4) amortization of mortgage servicing rights. As a result of the efforts necessary to reflect the restatements of prior periods, the Company expects to file for a 15 day extension to file its annual report on Form 10-K for the year ended December 31, 2005.

30.    MuniMae's finally filed its 2005 Annual Report with the SEC on June 22, 2006, wherein it identified seven material weaknesses as of December 31, 2005 regarding the following

areas: (1) an ineffective control environment, (2) an ineffective financial reporting process, (3) ineffective controls over the accuracy of the accounting for tax credit equity, (4) ineffective controls over the accuracy of accounting for deferral and recognition of bond and origination fees, (5) ineffective controls over the accuracy of the accounting for investments in partnerships using the equity method of accounting, (6) ineffective controls over the identification and valuation of certain derivative instruments, and (7) ineffective controls over the accounting for income taxes. The 2005 Annual Report stated, in relevant part:

> Management has identified the following material weaknesses as of December 31, 2005:
>
> 1. ***Ineffective control environment*** - We did not maintain an effective control environment as defined in the COSO framework. Specifically, we identified the following material weakness related to our control environment:
>
> - We did not maintain a sufficient complement of personnel with a level of accounting knowledge and experience in the application of GAAP commensurate with our financial reporting requirements and business activities, particularly as our business grew in diversity and complexity.
>
> - We did not maintain or disseminate accounting policy guidance with respect to certain areas with a sufficient level of precision to enable existing personnel to adequately analyze related transactions and apply accounting policies that were in conformity with GAAP.
>
> - Our control environment did not emphasize the need to maintain effective controls to monitor results of operations determined in accordance with GAAP. Specifically, we did not budget net earnings and did not maintain a process to monitor net earnings results against expected results.
>
> *          *          *
>
> 2. ***Ineffective financial reporting process*** - We did not maintain effective controls, including monitoring, over our financial close and reporting process. Specifically, we identified the following material weaknesses related to the financial reporting process:
>
> - Controls over journal entry review and account reconciliations failed to prevent or detect material financial statement errors. In addition, we failed to

design and implement exception and monitoring reports to review transactions and detect errors and to integrate our subsidiary and feeder systems with our general ledger system. As a result, our financial reporting process is manually intensive and is based on the review and approval of individual transactions (and resulting journal entries) without adequate compensating controls to detect errors.

- We did not maintain effective controls over the identification and disclosure of our segments. Specifically, we did not identify our segments or report their performance in the same manner for external reporting purposes and for reporting to our chief operating decision maker. This control deficiency resulted in segment disclosures that did not conform to GAAP.

31.    On September 14, 2006, the Company announced a second restatement. The Company concluded, based upon the recommendation of the Company's management, that certain previously filed financial statements covering the fiscal years ended December 31, 2003, 2004 and 2005, and the quarterly periods within those years, and the first quarterly period in the fiscal year ended December 31, 2006, should be restated.

32.    On October 26, 2006, the Company announced that it had dismissed PricewaterhouseCoopers LLP ("PwC") as its independent registered public accounting firm, effective immediately.

33.    Throughout 2007, the Company issued a series of incomplete disclosures concerning material inadequacies in the Company's internal financial controls and policies, often between or amongst positive statements concerning the Company's operations.

34.    On February 9, 2007, the Company stated that it knows of no reason why recent trading in the stock has resulted in a decrease in price. The Company was responding to an almost 15% drop in share price. MuniMae management noted that it is not engaged in sub-prime or any other single-family mortgage lending activities, and that its outlook for the multifamily rental sector

is positive.

35.    On May 4, 2007, the Company issued a press release entitled "MuniMae Announces

41st Consecutive Increase in Quarterly Distribution" which provided, in relevant part:

> The Company also announced updated information on its ongoing efforts to complete
> the restatement of its previously filed consolidated financial statements as well as its
> 2006 consolidated financial statements.  The Company has prioritized its restatement
> efforts by initially focusing its efforts on completing the audited financial statements
> of two key subsidiaries, MuniMae TE Bond Subsidiary, LLC ("TE Bond Sub") and
> MMA Mortgage Investment Corporation ("MMIC").  Completing these subsidiary
> level financial statements facilitates the Company's access to sources of capital and
> its ability to continue to originate mortgage loans that are ultimately sold to
> government-sponsored enterprises, such as the Federal National Mortgage
> Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation
> ("Freddie Mac").   The Company currently expects that the audited financial
> statements of TE Bond Sub and MMIC will be completed during the second quarter
> of 2007.
>
> As a result of prioritizing the completion of these subsidiary level audited financial
> statements, the need to consolidate the majority of the low income housing tax credit
> equity funds in which it holds interests, and its ongoing restatement efforts, the
> Company currently expects to file its 2006 annual report on Form 10-K on or before
> November 30, 2007.  As the Company's restatement effort has progressed, additional
> material weaknesses in its controls over financial reporting have been identified.
> Consistent with previously identified matters, the Company is developing and
> implementing remediation plans to address these weaknesses.  The Company has met
> with all its lenders to update them on its progress and current expectations.  Further,
> the Company has obtained waivers from all its lenders that provide for an extension
> for submitting the 2006 Form 10-K by November 30, 2007, and it is currently in
> compliance with all of its debt covenants.
>
> Since the Company did not file its 2006 annual report on Form 10-K in a timely
> fashion, the Company was notified by the New York Stock Exchange ("NYSE") that
> the NYSE would monitor the Company's filing status for a period of six months from
> the due date of the 10-K.  For companies that are unable to file their annual reports
> within six months from the required due date, the NYSE may, in its sole discretion,
> allow the company's securities to trade for up to an additional six month period.
> Management of the Company met with representatives of the NYSE to provide an
> update on the progress of its restatement efforts and current expectations for
> completion. The Company informed the NYSE that it expects to formally request an
> extension from the NYSE to continue listing its common shares beyond September 1,
> 2007 once the six month period commencing on the due date for the annual report

11

has elapsed, however, there can be no assurances that such extension will be granted. Management plans to update its lenders and the NYSE on a regular basis as it makes progress in its restatement efforts. The Company continues to cooperate fully with the Securities and Exchange Commission in connection with its non-public, informal inquiry.

36.     On July 10, 2007, the Company issued a press release entitled "MuniMae Announces Organizational Changes" which stated, in relevant part:

> The Company today also announced that it has engaged Navigant Consulting, Inc. to support Mr. Pinckney's efforts to complete the Company's restatement efforts. Mr. Falcone added, "The Company is fortunate to have engaged the services of the Navigant team. Their track record with complex accounting and restatement issues is an invaluable asset and, coupled with Charlie's skilled leadership and operational expertise, we believe that we have the pieces in place to complete our efforts and emerge a stronger enterprise."

> As previously disclosed, the Company has focused its efforts on completing the audited financial statements of TE Bond Sub and another of its subsidiaries, MMA Mortgage Investment Corporation ("MMIC"), as it simultaneously continues its efforts to complete the restatement of its financial statements and finalize its 2006 annual report. Mr. Falcone stated, "Completing the TE Bond Sub audit is a very important step along the road toward the completion of our restatement efforts and the filing of our 2006 annual report. As a result of noncash restatement adjustments, shareholders' equity in TE Bond Sub (whose common stock is 100% owned by the Company) as of December 31, 2005 was approximately $52.9 million higher than the $272.5 million previously reported and net income for TE Bond Sub for the year then ended was approximately $11.9 million lower than the $37.5 million previously reported."

> These restatement adjustments consist largely of corrections for errors related to the Company's estimation of the fair value of bonds (which increased shareholders' equity in TE Bond Sub by approximately $66.9 million as of December 31, 2005) and the Company's assessment of bond impairments (which decreased shareholders' equity in TE Bond Sub by approximately $14.1 million as of December 31, 2005), for the net increase of $52.9 million mentioned above, including certain other adjustments. The effects of these restatement adjustments are not necessarily indicative of the effects of other restatement adjustments that may be required in the Company's financial statements.

> Certain other subsidiary level audited financial statements, specifically some of those for funds the Company manages on behalf of others, have also been completed and provided to the appropriate investors.

The Company is continuing to work towards completing the audited financial statements of MMIC and has obtained extensions through August 31, 2007 from the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), each of which require audited MMIC financial statements. In addition, the Company has obtained waivers through August 31, 2007 from those of its lenders that require delivery of audited financial statements for MMIC, and it is currently in compliance with all of its debt covenants. The Company reiterated its intent to provide a mid-year review of the Company's performance in late July or August. At that time, the Company also expects to provide more information on the timing of the completion of MMIC's financial statements.

The Company today also announced information about material weaknesses in its internal controls over financial reporting that were identified by management during the preparation of the financial statements of TE Bond Sub and MMIC. Details about these material weaknesses, and others that have been identified as the Company's restatement efforts have progressed, are included in a Current Report on Form 8-K filed by the Company today.

37.     On September 4, 2007, the Company stated that it had received a six month extension by the NYSE, through March 3, 2008, of the time in which to complete and file its 2006 Annual Report on Form 10-K ("2006 10-K"), subject to reassessment by the NYSE on an ongoing basis. The Company stated that it expected to file its 2006 10-K prior to the extension date.

38.     During October and November 2007, the Company disclosed that it had entered into agreements with several of its lenders to extend the deadline for delivery of audited financial statements for the Company to February 15, 2008.

39.     On December 13, 2007, the Company stated that it had been asked by its shareholders to comment on the recent market activity of the Company's stock. Management of the Company stated that it was not aware of any pending transaction or event that might give rise to the recent volatility in the Company's stock price. In addition, management reiterated that the Company was not engaged in sub-prime or any other single family mortgage lending activities.

13

40.    On January 28, 2008, the Company issued a press release announcing its quarterly dividend. Therein, the Company disclosed, yet again, that it would be extending the time in which it believed it would file its restated financials.    However, as a result of missing the previously announced March 3, 2008 deadline, the Company would not meet the necessary deadlines to file current financial reports necessary to maintain listing status on the NYSE.    As a result, it would be delisted and trade on the over-the-counter market.    It further disclosed that it was slashing its dividend from $0.525 per share to $0.33 per share, and would be filing an 8-K with the SEC disclosing further changes in its accounting policies.    The press release provides, in relevant part:

> Municipal Mortgage & Equity, LLC (MuniMae or the Company, NYSE: MMA) announced today that its Board of Directors has declared a dividend distribution of $0.33 per common share payable on February 15, 2008 to shareholders of record as of February 5, 2008.    The Company also announced that while it expects to have completed by the end of February, its substantive work required to prepare its 2006 financial statements and its restated audited financial statements for 2005 and 2004, the Company does not expect to be able to file its audited financial statements by its previously announced goal of March 3, 2008.    Based on work done to date, the Company does not believe the results of the restatement will materially change the previously recorded cash balances of the Company and its subsidiaries.
>
> The reduction in the dividend distribution from $0.5250 to $0.33 per share is due to the cost of the Company's ongoing restatement of its financial statements, the decision by the Company to conserve capital to protect the long-term prospects of the business given the current volatility in the credit and capital markets, and the desire to dedicate additional capital to the high-growth Renewable Energy Finance business, an increasingly important part of the Company's business.    A portion of this dividend will be paid from sources other than cash generated from operations.    The Board of Directors will continue to review the Company's dividend payout on a quarterly basis based, among other factors, on the Company's net cash generation and the strategic needs of the business.
>
> "Knowing the importance of the dividend to our shareholders, it was a difficult decision to reduce the dividend," stated Michael L. Falcone, Chief Executive Officer.    "However, we believe that in this market it is important to be cautious in our approach to finding the balance between retaining capital to grow and to protect against uncertainty on the one hand, and distributing capital to shareholders as a dividend on the other. For 2007, our production numbers were solid, especially in

14

our MMA Renewable Ventures unit which finished the year with a strong pipeline of additional solar and other renewable and clean energy opportunities. We believe the diversity of our various businesses helps us to succeed even in a tough marketplace. In these uncertain times, we will continue to be prudent in our management of the business, while remaining watchful for the opportunities that such markets usually present. We hope in the future to grow the dividend as we complete our restatement and as market conditions allow."

*      *      *

Update on Restatement

The Company also announced that it is filing with the Securities and Exchange Commission ("SEC") a Form 8-K, available at www.sec.gov, which discusses the nature of the changes in the Company's accounting policies that are being made as a result of the Company's ongoing restatement efforts covering its 2006 results. The overall impact of the restatement and the changes in the Company's accounting policies are still being quantified; however, the Company believes that the final result of the restatement will not materially change the previously recorded corporate cash balances of the Company and its subsidiaries. However, work on the restatement and the 2006 financial statements has not been completed and further work on the restatement or the audit of the 2006 financial statements could change these results.

The ultimate impact of the restatement is dependent on management finalizing all areas of the restatement and the completion of the external audit. Although the Company continues to work to file its restated financial statements at the earliest possible time, the Company does not expect to meet the previously announced March 3, 2008, New York Stock Exchange ("NYSE") deadline for filing its 2006 Form 10-K. As a result, the Company expects that the NYSE will suspend trading shortly and commence delisting procedures. Upon suspension of trading on the NYSE, the Company's shares will begin to trade on the over the counter market pending a possible appeal and a final determination on the delisting. If the Company is delisted from the NYSE, the Company will be able to apply for relisting on the NYSE when all its filings with the SEC are current.

The Company currently expects to complete its unaudited financial statements for 2006 and its unaudited restated financial statements for 2005 and 2004 no later than mid-March 2008, and to file its Annual Report on Form 10-K for the year ended December 31, 2006, by May 30, 2008. The delay in completing the restatement and filing the Form 10-K is not expected to have any impact on the issuance of K-1's to shareholders in time for inclusion in their 2007 tax returns.

Michael Falcone concluded, "Thanks to the hard work of our employees and outside consultants and the support of the Board, we are making substantial progress on our

15

restatement efforts and are able to report to the marketplace this preliminary information.  Accounting for our business is complex; this combined with our previously announced change in auditors, necessitated a top-to-bottom review to ensure that our financial information is completely accurate.  Going forward we are dedicated to making sure that we have the policies, systems and people in place to meet our reporting obligations."

41.    On January 29, 2008, before the open of trading, the Company filed a Current Report on Form 8-K detailing additional "changes" to its accounting policies.  The January 29, 2008 8-K stated, in relevant part:

The press release discusses the pending restatement of our audited financial statements for the year ended December 31, 2005 and 2004.  That restatement has not been completed; however, we expect that the restatement will reflect the following changes to our accounting policies:

Inclusion in our consolidated financial statements of approximately 200 variable interest entities of which we are deemed the primary beneficiary even though we own only small minority equity interests.   The impact of consolidating previously unconsolidated ventures results in a substantial increase in the total assets on our balance sheet, in which we have a minor ownership interest.  The net income impact may be negatively affected by (i) inclusion of our share of losses of the consolidated entities, to the extent such losses are in excess of our general partner investments in those entities and (ii) inclusion of any amount by which the limited partners' shares of losses of consolidated entities exceeds their equity in those entities.

Changes in the way we recognize revenue for our low income housing tax credit business, the largest impact of which is the deferral of revenue (syndication fees and asset management fees) related to guaranteed funds.  In addition, the consolidation of these entities results in our eliminating asset management and guarantee fees, which we previously had recognized as a separate revenue item, and reflecting them instead as a component of the net income that results from the consolidation of these funds.

Changes in the way we account for loans, including the fair value of our held-for-sale loans we used in determining the lower of cost or market value of these loans, changes in the way we determine which held-for-investment loans are impaired and the amount of the impairment, and changes in the recognition of loan origination costs.

Changes with respect to our accounting for derivatives, including recognizing additional types of contracts as derivatives that must be marked to market, and other changes that affect the timing of profit and loss recognition.

16

Recognition of additional guarantee obligations as liabilities and changing the way some recourse obligations are amortized to income.

Changes to the estimated fair values of some of our bonds, derivatives, mortgage servicing rights and guarantee obligations, including increasing the value of some servicing rights we obtained through acquisitions or retained when loans were sold, which reduces the future income we will recognize with regard to those servicing rights.

Other changes in accounting relating to bonds, mortgage servicing rights, equity investments, equipment, leases, including changes to the amortization and depreciation with regard to certain assets. In addition, we corrected our purchase accounting on some acquisitions, determination of our share of earnings and losses on investments accounted for under the equity method, and manner and timing of recognition of expenses with regard to share based compensation awards (none of which involved option backdating).

Because neither the restatement nor the audit of our restated financial statements has been completed, it is possible that there will be additional changes as a result of the restatement. The changes as a result of the restatement will affect our financial statements for the year ended December 31, 2006 and subsequent years, as well as the financial statements that are being restated.

42.     The news shocked the market. As a result of the January 28 and 29 announcements, the price of the Company's common stock opened up for trading at $12.33 per share but immediately fell to below $10.50 per share, and closed for trading on January 29, 2008 at $9.19 per share, down $8.01 per share from the previous day's close of $17.20, or 46%.

43.     Prior to the January 29 trading day, as a result of the cumulative selective disclosures of the Company's ongoing fraud, themselves often incomplete, the price of the Company's common stock had dropped from a high of $32.20 per share on December 29, 2006 to a low of $13.25 per share on December 12, 2007.

44.     The statements previously made by Company officers were each materially false and misleading because they failed to disclose and misrepresented the true financial condition and

17

operations of the Company.  The following adverse facts which were known to Defendants or recklessly disregarded by them are: (1) that the Company has maintained artificially inflated asset values on a significant portion of its tax-exempt bond portfolio and has not properly recognized other-than-temporary impairments in its loan portfolio; (2) that the Company has failed to maintain adequate internal accounting controls and procedures, and has, in fact, overridden controls and procedures; and (3) that the Company's dividend was being funded in part by continuing equity and debt placements, and was not supported by the true financial performance of the Company.

45.     Consistent with the Company's purported successes, and despite the size of the Company's assets, from the Company's fiscal year 1998 through year-end 2005, the Company took total impairment and valuation allowances related to investments of merely $27.337 million.

46.     In direct contravention of the Company's own policy regarding other-than-temporary impairments and the valuation of its tax-exempt bond assets, as well as guidance provided by FAS 115 and the SEC, the Company disregarded impairment indicators on a substantial portion of its non-performing assets and continued to account for them as though they were either not non-performing or were merely subject to treatment as temporary impairments and accounted for as unrealized losses.  In so doing, the Company trumpeted its ability and intent to hold its non-performing assets until recovery, ignoring its own actions and statements which effectively caused the Company to relinquish such ability and intent.

47.     In fact, despite having information concerning the true value of its tax-exempt debt that required the Company to take substantial impairments pursuant to its own policy and the Generally Accepted Accounting Principles ("GAAP"), the Company continued to issue positive statements concerning its financial performance and prospects, and continued to misrepresent the

true value of its assets.

48.     Throughout the Relevant Period, the Company disclosed to investors the face value of non-performing bonds, unrealized losses on non-performing bonds and impairments the Company had recorded against non-performing bonds.  In connection with the non-performing assets, the Company also disclosed transactions it entered into in connection with certain non-performing assets that the Company disposed.  The Company's exposure to non-performing assets and its success in handling non-performing assets in a favorable manner was critical to investors' consideration of the Company's future prospects and in measuring the risks to the Company through its exposure to non-performing assets.

49.     In reality, the Company had not been successful in removing non-performing assets from its bond portfolio or in substantially recovering principle and accrued interest in its non-performing bonds.  Because of this, the Company knew, or should have known, that its purported past successes in handling non-performing assets were not an indication of its abilities in dealing with future non-performing assets yet failed to disclose such.

50.     Furthermore, MuniMae's Board failed to implement adequate internal controls which has resulted in its spending significant resources in internal investigations and implementing restatements of its financial reports filed with the SEC.  Despite the ***material weaknesses*** identified in the Company's 2005 Annual Report, MuniMae has been unsuccessful at fixing their internal controls and accounting protocol's.

51.     As early as September 2006, shortly after the Company's first restatement, a shareholder filed a shareholder derivative action in the Delaware Court of Chancery styled as *Wood v. Baum,* C.A. No. 2404-VCL (Del. Ch.) (the "Delaware Action").  The Delaware Action should

have and has raised sufficient "red flags" concerning MuniMae's conduct and the Board's knowledge of and participation in the wrongful conduct alleged herein.  Despite the ongoing litigation of the Delaware Action, the Company has still failed to address the core issue of overhauling its internal controls and protocols.  This has been demonstrated by the January 28 press release wherein defendants disclosed a reduction in the dividend distribution from $0.5250 to $0.33 per share is due to, among other things, the cost of the Company's ongoing restatement of its financial statements.  The January 29 press release further reinforces defendants failure to address known issues regarding internal controls and accounting procedures resulting in further need to correct ongoing restatements.  The market reacted swiftly, causing MuniMae's stock to plunge 46% by the close of trading on January 29, 2008.  The Individual Defendants knew of or consciously ignored the continued systemic violations and "red flags" presented to them.  This is nothing short of a total breach of the fiduciary duties of loyalty and good faith owed to the Company and its shareholders.

## DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

52.     As fiduciaries of the Company and by reason of their ability to control the business and corporate affairs of MuniMae, the Defendants owed the Company obligations of fidelity, trust, loyalty and care, were required to use their utmost ability to control and manage the Company's affairs in a fair, just, honest and equitable manner, and were required to act in furtherance of the best interests of the Company and its shareholders and not in their own personal interest and benefit.

53.     As senior officers and/or directors of the Company, the Defendants owed duties to the Company to conduct its affairs in good faith, in furtherance of the best interest of the Company and its shareholders and within the bounds of the law.

54.     In contravention of those duties and obligations, the Defendants caused MuniMae to engage in unlawful conduct which has severely harmed the Company.  As described herein, the Company has exposed itself to a barrage of private litigation, and enormous legal and other professional expenses in connection with the regulatory investigations, as well as to costs related to the defense of these actions.

55.     The Company's shareholders have brought suit for violations of the federal securities laws as a result of the artificial inflation of the Company's stock by the Company's false and misleading announcements.  The Company is now subject to potential civil judgments totaling tens of millions of dollars, in addition to the substantial legal and professional costs to be incurred in having to defend those actions.

56.     The Company's reputation has been severely damaged.

## DEMAND WOULD BE FUTILE

57.     Plaintiff brings this action derivatively in the right and for the benefit of MuniMae to redress injuries suffered and to be suffered by MuniMae as a result of the breaches of fiduciary duty by the Defendants and to recover certain Defendants' illegal insider trading profits.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

58.     Plaintiff will adequately and fairly represent the interests of MuniMae and its shareholders in enforcing and prosecuting its rights.

59.     Plaintiff is a holder of MuniMae common stock and was a holder of Company common stock during the period in which the Defendants' wrongful course of conduct alleged herein was occurring through the present.

60.     As a result of the facts set forth herein, Plaintiff has not made a demand upon the

Company's Board of Directors (the "Director Defendants") to institute this action against the Defendants. Such a demand would be a futile and useless act because a majority of the Director Defendants is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

61.    The Director Defendants exhibited a sustained and systematic failure to fulfill their fiduciary duties by actively participating or acquiescing in the wrongdoing alleged herein and/or by failing to implement adequate controls and procedures necessary to reasonably assure that the wrongdoing alleged herein did not occur which could not have been an exercise of good faith business judgment and the Defendant Directors face a substantial likelihood of liability for such breaches of fiduciary duties.

62.    The Director Defendants participated in the drafting, preparation, and/or approval of the various public communications complained of herein and were aware of, and/or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with MuniMae, each of the Defendant Directors had access to the undisclosed information about MuniMae's business prospects and as particularized herein knew (or recklessly disregarded) that the positive representations made by or about MuniMae, its business and its business prospects were materially false and misleading.

63.    The Director Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the Company's statements during the relevant period. Each Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after its issuance and/or had the ability and/or

opportunity to prevent its issuance or cause it to be corrected.  Accordingly, each of the Defendants was responsible for the accuracy of the press release and the representations contained therein.

64.     The Director Defendants had a responsibility and obligation to assure that all press releases and filings of SEC reports were truthful and not materially misleading and that proper controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are described in this complaint but failed to do so.

65.     As a result of their conduct described in the Complaint, each of the Director Defendants faces a substantial likelihood of liability for non-exculpated breaches of fiduciary duty. Among these non-exculpated breaches are the Director Defendants' abdication of their responsibility to implement adequate disclosure controls concerning the Company's financial information;

66.     MuniMae has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for such wrongful conduct that caused the filing of securities class actions against the Company, resulted in a formal SEC investigation of the Company, the halting of trading of the Company's securities, and the delisting of the Company's securities from the New York Stock Exchange.

67.     The Director Defendants have not only been complacent in acting on behalf of the Company, but were necessary actors in the improper conduct alleged herein, and have actively condoned and facilitated a campaign of deceit upon the shareholders of the Company through the Company's filings with the SEC, communications with the public, and the Board's authorization of dividend increases.  The Director Defendants approved option compensation, approved officers'

incentive compensation, and received their own stock options as compensation, thereby personally benefitting from the improper conduct alleged herein.  Moreover, they promoted the continuation of the scheme to further their personal interests as directors of the Company and as a result of their loyalty to Defendants Joseph and Falcone.  In addition, certain of the Director Defendants, including Defendants Joseph, Falcone and Berndt benefited financially through their personal interest in entities that benefitted financially through the transactions complained of herein.  Accordingly, the Director Defendants cannot possibly be expected to act independently in charging themselves with wrongdoing.

68.     In addition, it has already been demonstrated by the "red flags" raised by the Delaware Action and by the Company's own admissions in its 2005 Annual report, MuniMae's Board should have known, were complacent in, and participated in the wrongful conduct alleged herein.  Quite simply, defendants have failed to rectify the internal control and accounting issues identified in its 2005 Annual Report and have breached their fiduciary duties of loyalty and good faith owed to the Company and its shareholders on an ongoing basis.  The continued and systemic pattern of wrongful conduct throughout the Relevant Period represents a lack of good faith and has exposed MuniMae to costly and continued litigation, costly and continued restatements, and its stock to be delisted from the NYSE.

69.     All of the Director Defendants face a substantial likelihood of liability in this action because of their failure, as directors, to assure that a reliable system of financial controls was in place and functioning effectively.   The dramatic breakdowns and gaps in those controls were so widespread and systematic that the entire board faces substantial exposure to liability.   These directors either knew or should have known that violations of law were occurring and took no steps

in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for the Company.

70.     If the Director Defendants were to bring this derivative action against themselves, they would expose their own recklessness and misconduct which underlies the allegations against the Company contained in the class action complaints for violations of the federal securities laws which have been brought against the Company and many of the Defendants herein.  Such admissions would impair the Company's and their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Defendants.

### COUNT ONE
### Breach of Fiduciary Duty
### (Against All Defendants)

71.     Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

72.     Defendants had and have fiduciary duties of loyalty and care to ensure that the Company adopts and follows a competent, effective and honest business plan.  This plan is to ensure, among other things, compliance with contracts, various state and federal regulations regarding proper business practices, and state and federal laws, including the abdication of their responsibility to implement adequate disclosure controls concerning the Company's financial information.

73.     Defendants breached their fiduciary duties of loyalty and care by intentionally or recklessly approving, and/or deliberately and knowingly being indifferent to announcements regarding the Company's business.

74.     As a direct and proximate result, Defendants have exposed the Company to millions of dollars in potential civil liability, as well as significant legal fees, and untold compensatory and

punitive damages, for which they are liable to the Company.

## COUNT TWO
### Gross Negligence
### (Against All Defendants)

75.    Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

76.    Defendants had and have fiduciary duties of loyalty and care to ensure that the Company adopts and follows a competent, effective and honest business plan. This plan is to ensure, among other things, compliance with contracts, various state and federal regulations regarding proper business practices, and state and federal laws.

77.    The Director Defendants breached their fiduciary obligations by allowing and/or being indifferent to announcements regarding the Company's business. The Defendants acted with gross negligence, recklessness and/or bad faith in breaching these fiduciary duties.

78.    As a direct and proximate result, Defendants have exposed the Company to millions of dollars in potential civil liability, as well as significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

## COUNT THREE
### Abuse of Control
### (Against All Defendants)

79.    Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

80.    Defendants had and have the ability to control and influence MuniMae to act in the best interest of its shareholders, and to adopt and follow a competent, effective and legal business plan. This plan is to ensure, among other things, compliance with contracts, various state and federal regulations regarding proper business practices, and state and federal laws.

81.     The Defendants misconduct alleged herein constituted an abuse of their ability to control and influence MuniMae, for which they are legally responsible.

82.     As a direct and proximate result, Defendants have exposed the Company to millions of dollars in potential civil liability, as well as significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

## COUNT FOUR
### Gross Mismanagement
### (Against All Defendants)

83.     Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

84.     The Defendants, by their misconduct, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of MuniMae in a manner consistent with the operations of a publicly held corporation.

85.     As a direct and proximate result, Defendants have exposed the Company to millions of dollars in potential civil liability, as well as significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

## COUNT FIVE
### Breach of Contract
### (Against all Defendants)

86.     Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

87.     Defendants, as officers and/or directors of MuniMae, contracted with MuniMae, in exchange for substantial compensation and professional prestige, to act in the best interest of MuniMae and to cause MuniMae to operate lawfully.

88.     Defendants, by the actions and omissions detailed herein, breached their contractual

obligations and commitments to MuniMae to act in the best interest of MuniMae.

89.     As a direct and proximate result, Defendants have exposed the Company to millions of dollars in potential civil liability, as well as significant legal fees, and untold compensatory and punitive damages, for which they are liable to the Company.

90.     Defendants, as officers and/or directors of MuniMae, are liable to the Company for wasting these corporate assets.

### COUNT SIX
### Waste of Corporate Assets
### (Against all Defendants)

91.     Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

92.     As a result of the improper policies established and executed during the relevant period, and by failing to conduct proper supervision, Defendants have caused MMA to waste valuable corporate assets by improper transactions, payments of incentive awards to certain executive officers and incurring potentially millions of dollars worth of legal liability and/or legal costs to defend certain misconduct.

### COUNT SEVEN
### Contribution and Indemnification
### (Against all Defendants)

93.     Plaintiff incorporates by reference all the prior paragraphs as if fully set forth herein.

94.     MuniMae is alleged to be liable to various persons and/or entities by virtue of the same facts or circumstances as are alleged to give rise to Defendants' liability to MMA.  As a result of Defendants' conduct, MuniMae is exposed to the potential payment of substantial penalties in connection with any governmental investigations and liability arising from civil judgments.

95.     MuniMae's alleged liability on account of the acts alleged herein arises in whole or in

part from the intentional, reckless, disloyal and bad faith acts or omissions of Defendants as alleged above, and MMA is entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have or may in the future be asserted against MMA by virtue of Defendants' misconduct.

## PRAYER FOR RELIEF

**WHEREFORE,** plaintiff prays for judgment and relies as follows:

A     Determining that each Defendant breached his or her fiduciary duty;

B.     Requiring the Defendants to account to the Company for their and others' unlawful profits gained through compensation, bonuses and/or insider trading during the relevant period and establishing a constructive trust for their deposit;

C.     Awarding MMA compensatory damages against Defendants in an amount to be determined at trial, together with prejudgment interest at the maximum rate allowable by law;

D.     Awarding plaintiff costs and disbursements and reasonable attorneys' and experts' fees and expenses; and,

E.     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: March 13, 2008                          Respectfully submitted,


                              _____/s/_____
                              Donald J. Enright (MD013551)
                              Elizabeth K. Tripodi
                              **FINKELSTEIN THOMPSON LLP**
                              1050 30th Street, NW
                              Washington, D.C. 20007
                              Telephone: 202.337.8000
                              Facsimile: 202.337.8090


                              *Local Counsel for Plaintiffs*


                              **SARRAF GENTILE LLP**
                              Ronen Sarraf
                              Joseph Gentile
                              11 Hanover Square
                              New York, NY
                              Tel.:  (212) 868-3610
                              Fax:  (212) 918-7967

                              **RIGRODSKY & LONG, P.A.**
                              Seth D. Rigrodsky
                              Brian D. Long
                              919 North Market Street, Suite 980
                              Wilmington, DE  19801
                              Tel.:  (302) 295-5310
                              Fax:  (302) 654-7530


                              *Attorneys for Plaintiff*